UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL TABE,                                          )
                                                     )
                         Plaintiff,                  )
                                                     )
            v.                                       ) Civil Action No. 07-02043 (RMU/AK)
                                                     )
ALLIEDBARTON SECURITY SERVICES, LLC,[1] )
                                                     )
                         Defendant.                  )
_____)

PLAINTIFF'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, Plaintiff Angel Tabe, by her

undersigned attorney, hereby moves the Court for leave to file her Amended Verified Complaint

and in support of this motion states:

1.      Plaintiff, who is not an attorney, filed her administrative complaint with the Equal

Employment Opportunity Commission *pro se*.  The complaint was cross-filed with the District of

Columbia Office of Human Rights.  See Exhibit 4 to Complaint.

2.      Plaintiff's EEOC complaint alleged both disability and gender discrimination against

Defendant AlliedBarton Security Services, LLC.

3.      Plaintiff also filed her Complaint in this case *pro se*.  The Complaint alleges that

defendant discriminated against plaintiff on the basis of her disabilities, in violation of the

Americans with Disabilities Act of 1991 (ADA), 42 U.S.C. § 12203, by failing or refusing to

accommodate plaintiff's disabilities, pursuant to her requests, and by terminating plaintiff on or

about November 10, 2004.

---

[1]  The caption is corrected to reflect the correct name of defendant.

4.    In January 2008 plaintiff retained the undersigned to represent her in this case, and he entered his appearance herein on January 14, 2008.

5.    Plaintiff needs to file an amended complaint, at the very least, to set forth clearly the elements of her *prima facie* claims of disability discrimination by defendant –including its refusal to grant her requests for accommodation, its insistence that she work without prescribed braces on her knees and back, and its discharge of her when she refused to remove the braces.

6.    Therefore, the attached Amended Complaint clearly sets forth facts supporting plaintiff's discrimination claim –*i.e.*, that she was a qualified individual with a disability under the ADA, 42 U.S.C. § 12102(2); that she made requests for reasonable accommodations; that defendant failed to afford her reasonable accommodations or engage in the "interactive process"; and that she was terminated -- and her prayer for relief.

7.    As indicated above (p. 1), in her EEOC/OHR complaint plaintiff charged defendant with not only disability discrimination, but also gender discrimination.  One of the principal decision-makers for defendant in this action –in denying plaintiff's requests for accommodation, in constructively discharging her, and in discharging her—was Maj. Arthur Milling.  The evidence shows that Maj. Milling repeatedly sexually harassed plaintiff over a period from September 2001 to November 2004; that he was clearly antagonistic towards her for rebuffing his advances; and that he discharged her not only because he did not want to accommodate her disabilities, but also because she rebuffed his sexual advances.  See Amended Complaint.

8.    As plaintiff will explain in more detail in reply to defendant's response to this motion, after she receives her EEOC file, which she requested under the Freedom of Information Act in January 2008 and she expects to receive soon, investigation of plaintiff's new Title VII

gender (sexual harassment) discrimination claim in her Amended Complaint would reasonably be expected to flow from her checking the gender discrimination box on her administrative complaint.[2]  *See Park v. Howard Univ.,* 71 F.3d 904, 907 (D.C. Cir. 1995) (the court complaint must make allegations which were within the scope of  "the administrative investigation that can reasonably be expected to follow the charge of discrimination.").  *Cf. Maryland v. Sodexho*, 474 F.Supp. 2d 160 (D.D.C. 2007) (plaintiff checked only the "retaliation" box, not boxes for other claims which he sought to present in his court case). [3]  Therefore, plaintiff adds a Title VII gender discrimination claim in her amended complaint.  Her attorney's April 22 letter to defendant appraised it fully of her sexual harassment allegations, as well as her disability discrimination claims.[4]

9.    Plaintiff also adds a second gender discrimination sexual harassment claim, under the District of Columbia Human Rights Act (DCHRA), District of Columbia Code § 2-1402.11(a)(1) (2001).  Plaintiff has the right under the DCHRA, D.C. Code §§ 2-1403.03(b), 2, 2-1403.16 (2001), to bring a private cause of action for alleged violations of said Act, without the necessity of exhausting any particular administrative remedies which were also available to her.  Also under that statute, § 2-1403.16(a), the time for her to file her private cause of action is tolled while the case is pending, not just at OHR, but also at EEOC since EEOC and OHR share cases under a work-sharing arrangement.  *See Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564 (D.C. 2007); *Le v. Interstate Mgt. Co.*, LLC, Civil Case No. 2006 CA 008572 B (D.C. Sup. Ct., July

[2]  As yet, defendant has produced no documents as part of its Initial Disclosures.  Plaintiff has requested the documents which defendant identified in those Initial Disclosures, but defendant has not yet submitted them to plaintiff.
[3]  In  *Fed'l Exp. Corp. v. Holowecki*, 128 S.Ct. 1147, 76 USLW 4110, 102 Fair Empl.Prac.Cas. (BNA) 1153 (U.S., Feb 27, 2008) (No. 06-1322), the Supreme Court recently held that an intake questionnaire response should be construed as a charge.
[4]  Her attorney's April 22 letter to defendant appraised it fully of her sexual harassment allegations, as well as her disability discrimination claims.

31, 2007) (held that OHR's deferral of its jurisdiction in favor of an EEOC investigation after EEOC had cross-filed with it, constitutes a termination of OHR proceedings and re-starts the running of the one year statute of limitations which would have been tolled by the cross-filing); *Kensil v. Union Labor Life Ins. Co*., No. 05 CA 7313, at 3 (July 31, 2006) (DCHRA statute of limitations tolled while "complaint is pending before the EEOC"); *Adams v. Howard Univ.*, No. 00 CA 7610 at 3 (D.C. Super. Ct., Apr. 28, 2004) (under worksharing agreement, DCHRA statute of limitations tolled by EEOC charge); *Vitikacs v. Am. Legion*, 2003 WL 22004935 at 3 (D.C. Super. Ct., No. 02ca10202, June 8, 2003); *Estenos v. PAHO/WHO Federal Credit Union*, 131 Daily Wash. L. Rptr. 537, 538 (D.C. Super. Ct., Feb. 3, 2003) (cross-filing tolls statute of limitations under DCHRA).  Under the preceding authorities, plaintiff's DCHRA claim is timely and relates back to her original complaint of discriminatory discharge.  *See Soxeho*, *supra*.

10.    The sexual harassment amendments attack not the sexual harassment which preceded the constructive discharge and discharge of plaintiff, but provide another illegal motivation for the same employer actions involved in Count I, the ADA claims – the constructive discharge and discharge.

11.    Federal Rule 15(a) provides, of course, that leave to amend "shall be freely given when justice so requires."  *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Jarrell v. U.S. Postal Serv.*, 243 U.S. App. D.C. 350, 353, 753 F.2d 1088 (1985); *Green v. Am. Broad. Cos.*, 647 F.Supp. 1359, 1367 (D.D.C. 1986); *Hammerman v. Peacock*, 607 F.Supp. 911, 917 (D.D.C. 1985).  As the Supreme Court held in *Foman*,

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.  In the absence of any apparent or declared reason - such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance on the

amendment, futility of amendment, etc.- the leave sought should, as the rules require, be "freely given."

371 U.S. at 182. *Accord*, *Sinclair v. Kleindienst*, 207 U.S. App. D.C. 155, 645 F.2d 1080, 1085 (1981), *appeal after remand*, 229 U.S. App. D.C. 13, 711 F.2d 29l ("Only limited circumstances justify a district court's refusal to grant such leave to amend: undue delay, bad faith on the part of the moving party, or undue prejudice to the opposing party.").  "In exercising its discretion [whether to grant a motion to amend a pleading], the trial court may consider, among other factors, undue delay, dilatory motive on the part of the movant, and undue prejudice to the opposing party by virtue of allowing the amendment."  *Hammerman*, 607 F. Supp. at 917.  None of those factors is present here, as shown below.

12.     The parties are just beginning discovery.  While defendant has already served discovery responses, in a "demand letter," which the undersigned sent it on April 22, 2008, plaintiff apprised defendant of all the essential elements of all her claims in the Amended Complaint.

13.     The Amended Complaint attached hereto does not materially change the nature of plaintiff's ADA claims.  *See Parker v. Baltimore & Ohio R.R.*, 652 F.2d at 1018, 1021; *Thompson v. Machinists*, 33 FEP Cases 641, 642 (D.D.C. 1983) ("All of plaintiff's claims arise naturally and logically from the facts presented to the EEOC and are closely related, rather than separate and distinct.  [citations omitted]").  It will hardly prejudice defendant for the Court to allow plaintiff to file the Amended Complaint.

14.     Defendant's counsel has been apprised that plaintiff would be amending her complaint and has been sent a draft of the Amended Complaint (without the sexual harassment counts).  She states that defendant "expressly reserves the right to object to any motion to amend the complaint Plaintiff may file without Defendant's consent and reserves any and all defenses that may be applicable to any proposed amended complaint Plaintiff may submit."

15.     Granting this motion will serve the interests of justice.

WHEREFORE, plaintiff respectfully requests that the Court grant her leave to file the attached Verified Amended Complaint.


Respectfully submitted,


_____/s/ Alan Banov_____
ALAN BANOV #95059
Alan Banov & Associates
8401 Colesville Road, Suite 325
Silver Spring, MD 20910
301-588-9699; fax:  301-588-9698
abanov@banovlaw.com
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ANGEL TABE                                          )
614 Ethan Allen Avenue                              )
Takoma Park, MD 20912,                              )
                                                    )
          Plaintiff,                                )
                                                    )
     v.                                             )  Case No.1:07-CV-02043 (RMU/AK)
                                                    )
ALLIEDBARTON SECURITY SERVICES, LLC,[1] )
700 19th Street, N.W.                               )
Washington, DC 20433,                               )
                                                    )
          Defendant.                                )
_____)  <u>JURY TRIAL DEMANDED</u>

### <u>AMENDED VERIFIED COMPLAINT</u>
(Disability and Gender Discrimination/Sexual Harassment)

## A. <u>PRELIMINARY STATEMENT</u>

1.     The Court has jurisdiction of this case under 28 U.S.C. §§1331, 1343; Title I of

the Americans with Disabilities Act of 1991 (ADA), 42 U.S.C. § 12117(a); Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. §2000e-5(f); and the District of Columbia Human

Rights Act (DCHRA), District of Columbia Code §§ 2-1403.03(b), 2-1403.16 (2001).

2.     Venue properly lies within this District under Title VII, 42 U.S.C. § 2000e-5(f),

because Defendant AlliedBarton Security Services does business within the District of Columbia

and because plaintiff's claims arose within this judicial district.

## B. <u>THE PARTIES</u>

3.     Plaintiff Angel Tabe is a resident of Takoma Park, Maryland, and a former

employee of AlliedBarton Security Services (hereinafter "defendant").

4.     AlliedBarton Security Services is a security officer services company which

assertedly employs over 50,000 employees across the United States, including the District of

---

[1]    The caption has been corrected to state defendant's correct name.

Columbia.  At all times relevant to this action, defendant was an "employer" as defined by § 701(b) of Title VII, 42 U.S.C. § 2000e-(b)

## C.  FACTS CENTRAL TO PLAINTIFF'S CLAIMS

5.      On or about February 6, 2000, plaintiff was involved in an automobile accident in Delaware and injured her head, shoulder, cervical spine, right knee, and back.

6.      As a result of the accident, plaintiff suffered a severe, on-going lumbar strain injury and a posterior lateral tear in her right knee.

7.      In 2000, plaintiff underwent surgery on her right knee and used crutches for several months; she underwent physical therapy for her injuries until approximately December 2000.

8.      The accident left plaintiff wearing two braces – one on her right knee and the other on her lower back.

9.      In September 2001, notwithstanding her injuries, Plaintiff Tabe was hired as a Security Officer by The Wackenhut Corporation, defendant's predecessor on the job, and assigned to work at the International Monetary Fund's headquarters, located at 700 19th Street, N.W., in Washington, D.C.

10.      While Wackenhut required her to wear a uniform, consisting of a coordinating shirt, pants and jacket, its uniform substantially concealed plaintiff's back brace, as the lower portion of the brace fit inside her pants and the jacket covered the upper part of the brace, which she wore over her uniform shirt.

11.      One of plaintiff's supervisors was Senior Captain Arthur Milling, a male.

12.      Capt. Milling administered and oversaw the project's security operations.

13.      During the duration of their employment at Wackenhut, and subsequent employment with defendant, Capt. Milling had supervisory authority over plaintiff.

14.     Starting in September 2001, and continuing throughout the duration of her employment with Wackenhut, and again in November 2004, during their subsequent employment with AlliedBarton, Capt. Milling repeatedly harassed plaintiff sexually, through on or about November 10, 2004, when he, as an AlliedBarton supervisor, wrongfully terminated her.

15.     Plaintiff repeatedly rejected his inappropriate advances.

16.     Upon information and belief, requests for transfer and similar accommodations were subject to Capt. Milling's approval.

17.     During the course of their employment with Wackenhut and subsequent employment with defendant, Capt. Milling repeatedly blocked her requests for accommodation for her disability through November 10, 2004, when he, as an AlliedBarton supervisor, wrongfully terminated her.

18.     When Ms. Tabe reported for her first day of work at Wackenhut, another employee escorted her to Capt. Milling.

19.     Capt. Milling informed her that he, rather than Patrick Nebo, the project manager, assigned duties, scheduled work hours, and decided who would work there.  Capt. Milling then assigned Ms. Tabe to the night shift.

20.     Capt. Milling later showed plaintiff a cabinet in the Security Operations Center ("SOC"), where she safely could store personal items while on duty, and told her that she could store her uniform shirt and jacket in his office.

21.     Over the next few months, plaintiff realized that Capt. Milling's instructions for storing her personal items were unusual, against policy, and that he did not give other, similarly situated employees such benefits.

22.     Between September and December 2001, Capt. Milling committed his first overt incidents of sexual harassment.

23.     Several times when he encountered plaintiff, he would say, "One of these days I'm gonna take you home with me," "I want you to come home with me," and similar comments. In response, plaintiff would tell him, "No."

24.     Ms. Tabe felt uncomfortable with his advances and, in an effort to discourage such advances, tried to ignore and downplay them.  She also tried to avoid him.  For example, if she was headed in a particular direction, and saw him headed towards her, or in her path, she would try to walk a different way to prevent their paths from crossing.  However, this was not always possible and when she encountered Capt. Milling, he continued to make similar comments to her.

25.     Despite wearing braces on her back and knee, Ms. Tabe capably and successfully performed her duties as a security officer.

26.     In early- to mid-2002, as a recommendation from the Takoma Park Area office, she successfully trained as a Property Resource Officer ("PRO"), which earned her a permanent status at the IMF site.

27.     Capt. Milling assigned her to the evening shift.  Plaintiff was assigned to the turnstile at the lobby entrance, which required her to stand, as well as escort people throughout her 8-hour shift.  Wackenhut permitted her to take a 15-minute break every 30, 45, 60, or sometimes 90 minutes.

28.     At all relevant times plaintiff has suffered from a chronic, disabling back and leg condition, which have caused substantial adverse impact on her major life activities, such as walking, sitting, sleeping, and standing.

29.     By mid-to-late 2002 plaintiff's condition had become a disability.

30.    Her disability has required plaintiff to wear braces on her back and knee.

31.    Beginning in mid-2002, as she worked the evening shift, plaintiff began to experience increasing pain in her legs and back, particularly when walking on steps or up a slope.

32.    She explained her medical conditions to her supervisor, Captain Edgar Angulo.

33.    Capt. Angulo asked for medical reports supporting her request, adding that a favorable decision would be automatic with medical documentation.

34.    Within several days, plaintiff submitted appropriate medical documentation, but Capt. Angulo did not transfer her immediately, because such transfer requests had to be submitted to Capt. Milling for his approval.

35.    Plaintiff discussed her medical concerns and transfer request with two project managers, each of whom informed her she would be transferred to the I-Square, another project building.  At I-Square, she would be able to perform most of her duties while seated.

36.    At the I-Square building, a significant number of the duty stations involved seated positions for security officers.

37.    However, between 2002 and 2003, Capt. Milling blocked her transfer.

38.    Captain Sallie Douglas, the evening shift supervisor, informed her that her transfer had been denied and that "the bottom line is that Capt. Milling thinks you should look for another job."

39.    Plaintiff complained to Capt. Douglas of sexual harassment by Capt. Milling, telling her about his ongoing sexual advances and frequent comments that he was going to take her home with him.

40.     Capt. Douglas recalled overhearing Capt. Milling state that he wanted plaintiff to marry him and make him happy.  Capt. Douglas also warned plaintiff, "Be careful because, if anything, you would be the one to leave," since he was the boss.

41.     Also in mid-to-late 2002, Ms. Tabe often visited Dr. Christopher Magee, an orthopedic surgeon, and he issued her three disability certificates containing work restrictions. He also prescribed stronger pain medication for her.

42.     On or about July 31, 2002, Dr. Magee issued a disability certificate for plaintiff with the following restriction:  "Permanent light duty w[ith] no standing over 30 mins."

43.     Plaintiff presented this certificate to her supervisor, Capt. Angulo, but the employer did not accommodate her disability with light duty.

44.     In about October 2002, he examined her legs and determined that her left knee – the "good" one—was also deteriorating.  He explained that, since she tried to avoid placing much weight on her injured right knee, she was putting too much pressure on the left, and he prescribed a brace for her left knee.

45.     Ms. Tabe was now wearing braces on both knees, as well as on her back.

46.     However, none of the braces was visible at her turnstile post because they were covered by the Wackenhut company uniform.  Wackenhut's officers wore jackets over uniformed shirts, which were tucked in, and pants.  The Wackenhut jacket concealed her back brace, revealing it only when she removed her jacket, such as during her lunch break.

47.     On or about October 7, 2002, Dr. Magee issued another disability certificate to her.  It contained the following work restriction:  "Recommend sitting position, standing highly discouraged."

48.     Plaintiff again presented this certificate to Capt. Angulo, but the employer did not make an accommodation for her.

49.     On or about October 21, 2002, Dr. Magee examined her again.  He found a decreased range of motion in her knees and noted that the pain "has interfered with her ability to stand and walk at work."  He recommended that she "work at a sedentary status with occasional standing for no longer than one hour during an eight-hour shift."

50.     Also on October 21, Dr. Magee issued her a new disability certificate with heightened work restrictions.  It prescribed: "Light duty = sedentary work w/occasional standing less than 1 hr per 8 hr shift @ intervals of 10-15 min max."

51.     Plaintiff presented this certificate to Capt. Angulo, but again the employer did not grant her an accommodation.

52.     Meanwhile, Maj. Milling continued to make inappropriate and unwelcome sexual advances toward plaintiff, and she consistently rejected them.  For example, he told Ms. Tabe that he had divorced his wife and was now "single and available" for her.  He also gave her a telephone number (beginning with a 703 area code), to call him.

53.     Effective on July 1, 2004, Defendant AlliedBarton assumed the contract with IMF.

54.     The month of June 2004 was a transition period from Wackenhut to AlliedBarton.  Defendant conducted its own employee screening.  Plaintiff successfully undertook the screening process, and defendant became her employer as of July 1, 2004.

55.     Also in June 2004, defendant reviewed the security officers' uniforms to ensure they met its appearance standards.  During this process, employees were asked to try on and show their uniforms to the issuing officer for his approval.

56.     The issuing officer gave plaintiff a uniform to try on for him, and she did so, and he approved her uniform.

57.     Since Ms. Tabe was an excellent employee, with significant experience, defendant asked her to help train new staff over the weekends.

58.     On or about June 24, 2004, IMF held a picnic in Maryland.  At the picnic, Maj. Milling asked her when she was "going to be serious" about him.  In response, plaintiff told him, firmly, never to raise such an issue with her again.

59.     Thereafter, Maj. Milling began to treat her coldly and ceased to speak to her unless she initiated conversation, which was always work-related.

60.     Maj. Milling learned that she had applied directly to IMF for a security position that was open to the public and threatened to fire her if she ever did that again.

61.     Throughout her employment with defendant, plaintiff continued to suffer from a disabling back and leg condition.  Her injuries significantly restricted or prevented her from engaging in major life activities, including walking, showering, cooking, sleeping, shopping for groceries, and standing.  Such activities were extremely painful for her and she could fall very easily.  In order to cope with the pain, she constantly wore her back brace, including while she slept and removing it only to shower.

62.     In early July 2004, on the recommendation of IMF Security Division director, Mr. Norman Schroeder, and IMF Security Services Manager Jeremy Stone, project manager Leon Beresford and discussed with plaintiff, who has studied and worked as a journalist, the commencement of a project newsletter, which she would edit.

63.     Mr. Beresford and plaintiff concluded that she would have a desk and computer at her disposal to produce a "dummy" (sample) of the newsletter.

64.     However, from then until early November 2004 defendant made no mention of the desk, computer, dummy, or newsletter.

65.    Capt. Karen Yates, plaintiff's supervisor, and a former Wackenhut employee, was well aware of plaintiff's disabling condition and had previously seen her back brace.

66.    Under Wackenhut, Capt. Yates had asked plaintiff to work overtime in positions that required standing.  Plaintiff told Capt. Yates about her medical condition and explained that it was very painful to stand for her regular duties.  Plaintiff told her she could not bear overtime work that entailed further standing.  Thereafter, when Capt. Yates asked plaintiff to work overtime, she would give her posts that involved mostly sedentary tasks.  When Capt. Yates asked her to work overtime, she would tell plaintiff that it was not a standing assignment.

67.    Under AlliedBarton, Capt. Yates told plaintiff that she had her to a reception position permanently, but plaintiff was later reassigned to the Child Care Center.  Still Capt. Yates would schedule plaintiff for overtime work only if it involved mostly sedentary tasks.

68.    Around July or August 2004, defendant's new supervisor at I-Square (name unknown) made an open appeal to experienced staff to transfer to his site.

69.    Transfers between defendant's sites and shifts were normal and common amongst defendant's employees.

70.    After Capt. Yates initially encouraged her to transfer, Ms. Tabe formally applied for a transfer by submitting her transfer application to Capt. Yates.

71.    Plaintiff's transfer request was subject to Maj. Milling's approval.

72.    Plaintiff discussed the pending transfer with the I-Square supervisor, who told her that he really needed experienced workers and was excited that she was seeking to join him.

73.    Approximately two months later, however, Capt. Yates told plaintiff that she would not be transferred.  She gave no explanation for the denial.  When plaintiff inquired about the reason why she would not be transferred, Capt. Yates told her, "Tabe, forget about it; it's not gonna happen."

74.     Thereafter, neither Capt. Yates nor the I-Square supervisor again discussed the possibility of such a transfer with Ms. Tabe.

75.     On or about Thursday, November 4, 2004, Ms. Tabe notified defendant of her disability and formally requested a reasonable accommodation.

76.     On or about that day Ms. Vasquez (first name unknown), one of defendant's employees, coordinated the recall of spring jackets and the distribution of autumn sweaters.

77.     When plaintiff went to turn in her jacket, Ms. Vasquez told her, "You look sloppy." Ms. Vasquez insisted that plaintiff return her uniforms (pants and shirt) and sign out new sets that were one size smaller, even though in June the issuing officer had approved plaintiff's uniforms.

78.     Ms. Tabe tried to explain that the pants on a smaller uniform would be too tight to accommodate the lower portion of her back brace and why the brace was medically necessary. However, Ms. Vasquez refused to listen to her explanation.

79.     Ms. Vasquez instructed Ms. Tabe not to wear the sweater until the following Monday, November 8, 2004.

80.     Ms. Tabe asked to retain her spring jacket until November 8 (the following Monday) to conceal her back brace. However, Ms. Vasquez refused to allow her to keep the jacket or wear the sweater, which meant that the upper portion of her brace would be plainly visible for the remainder of the day, as well as on Friday, November 5.

81.     Later on November 4, plaintiff described the encounter with Ms. Vasquez to Mr. Beresford, the Project Manager, and asked him for a reasonable accommodation for her disability

82.     Plaintiff described her automobile accident, her subsequent pain and disability, and her doctors' orders.  Plaintiff also removed her outer jacket to show him that the upper portion of her back brace was plainly visible without a jacket.

83.     Plaintiff asked for reasonable accommodations, and even suggested ways of accommodating her brace, such as permitting her to wear the spring jacket until Monday (only one more day) or allowing her to wear the sweater before then.

84.     However, Mr. Beresford refused to make any exceptions for her.

85.     Plaintiff also explained that defendant could accommodate her disability by transferring her to one of the seated positions at I-Square, and inquired about the transfer to I-Square for which she had applied.

86.     Mr. Beresford told her that he recalled seeing her transfer papers, but did not know the status of her application.

87.     Plaintiff asked him if he could help her accelerate the process.  In response, Mr. Beresford stated that he would see what he could do.

88.     On the next day, Friday, November 5, plaintiff reported for duty and was assigned to a new post – the turnstile in the front lobby, instead of the Child Care Center, her regular post.

89.     Since her jacket and hat were not allowed inside the building, plaintiff left them at the reception desk.  She rushed to relieve her colleagues on the day shift.

90.     A few minutes later, Capt. Yates removed plaintiff from the post.  As plaintiff stood on post, Capt. Yates looked at Ms. Tabe and, referring to the plainly visible back brace, removed her from the post, stating, "Oh, no, Tabe, I cannot let you stand on post like that!"

91.     Capt. Yates escorted plaintiff to the office of Mark Odom, defendant's quality assurance manager.  Maj. Milling[2] was in Mr. Odom's office, and plaintiff's personnel file was on the desk.  Mr. Odom told her to "wait outside," and the door shut behind her.

92.     Shortly thereafter, Capt. Yates summoned her back into the office.

93.     During this meeting, defendant constructively discharged plaintiff, by refusing to accommodate her brace and insisting that she disregard her doctor's orders to wear the brace, since she could not work without the brace.

94.     Mr. Odom presented Ms. Tabe with a typewritten form to sign.  The form stated (falsely) that plaintiff was capable of working without the brace.

95.     Plaintiff explained to them that her doctor had told her she <u>must</u> wear the brace at all times during her waking hours and, therefore, she could not sign the form.

96.     Mr. Odom then told Ms. Tabe that she would be required to go home and could not return to work until she produced a doctor's note stating that she could work <u>without</u> the brace.

97.     Thus, Mr. Odom insisted that Ms. Tabe reject her doctor's medical recommendations for coping with her disability, just to satisfy some image that AlliedBarton felt it needed to portray to the public.

98.     Ms. Tabe expressed her fear that her physician (Dr. Rosita Dee) would refuse to issue such a note.  She requested a statement from Mr. Odom indicating AlliedBarton would not accommodate her brace.

99.     He told her such a letter could be initiated through Human Resources, but, "in the meantime, you go home until you can produce a doctor's note saying you can work without the

---

[2]   By this time, Capt. Arthur Milling had been promoted to Major.

brace." At this point, because defendant was effectively insisting that plaintiff satisfy a requirement that was unhealthy for her, it was constructively discharging her.

100.    Ms. Tabe then turned to Maj. Milling, believing he would recall her medical condition when they worked at Wackenhut, and reminded him that there were medical papers in her file to support her disability. However, Maj. Milling asked, "Which file? Wackenhut left and took with them the files of their employees."

101.    Ms. Tabe continued to press them for written confirmation that AlliedBarton could not accommodate her with the brace. In response, Mr. Odom told her to go to her doctor and not to return to work unless and until she could produce medical documentation stating that she could work without the brace.

102.    At the conclusion of this meeting, defendant restrained plaintiff and did not permit her to move freely in the building.

103.    As she walked out of the office, Ms. Tabe encountered Mr. Beresford, with whom she had met the previous evening concerning the uniform. She asked him if they could talk, explaining the urgency. He refused.

104.    Capt. Yates then interjected and rudely declared, "Tabe, I have been instructed to escort you out, and you are not allowed to speak with anyone."

105.    Capt. Yates proceeded forcibly to escort plaintiff to the women's locker room. Capt. Yates told plaintiff to collect her personal belongings and watched her do so.

106.    Capt. Yates then escorted plaintiff out of the building as other IMF staff, visitors and her colleagues watched.

107.    In the past, only individuals who had been fired for unprofessional conduct were restrained and treated in such a manner.

108.    At the lobby, plaintiff realized that her jacket, hat, and other items were still at the reception desk.  Capt. Yates bluntly told her that she did not feel like going back; nor was she letting plaintiff go unescorted.

109.    To date defendant has never returned these items to her.

110.    On November 10, 2004, after taking the first available appointment with her Dr. Dee, plaintiff returned to the IMF building with a doctor's note which clearly stated that she needed to continue wearing the brace and explained why.

111.    Dr. Dee's note, also dated November 10, stated: "Patient is medically advised to use back brace on a continuous basis for her well-being + safety.  If there are any questions or concerns, please feel free to call."

112.    Plaintiff also brought copies of three older medical notes explaining her medical condition which she had previously submitted to Wackenhut.

113.    On her arrival at the lobby front desk, plaintiff again was restrained and not permitted to proceed on her own downstairs to management.

114.    Sgt. Angela Dodd escorted her to Mr. Odom's office. Plaintiff was asked to wait outside his office.  At this point, Sgt. Dodd did not leave her alone, but waited there with her the entire time.

115.    Approximately thirty minutes later, Mr. Odom told her that Maj. Milling, not he, would see her.  Maj. Milling then met with plaintiff.

116.    Maj. Milling read Dr. Dee's statement that it was medically necessary for her to continue wearing the back brace.  He also read the certificates of disability which Dr. Magee had completed and which she previously had submitted to Wackenhut.

117.    Maj. Milling handed the papers back to her and bluntly told plaintiff:  "You can no longer work here."

118.    Ms. Tabe asked him whether she should go to the area office.  He replied, sarcastically, "Hmmm, which area office?  This is not Wackenhut."

119.    Plaintiff specifically asked Maj. Milling to put his decision in writing, but he refused, stating, "I do not want to be the one to commit myself."

120.    Plaintiff handed the medical papers back to him, informing him that they were for the company.  She asked him to keep the originals and give her copies for her records, and he did so.

121.    Strangely, on one of the copies, Maj. Milling placed a telephone number and asked plaintiff to call the number.  Plaintiff noted that the telephone number began with a 703 area code and suspected it might be the number that he had given her before when he was sexually harassing her.

122.    On or about November 23, 2004, plaintiff received a telephone call from Erin Headen, defendant's administrative assistant.  Ms. Headen first claimed that she had left messages for Ms. Tabe, then blurted (falsely), "Nobody fired you.  Maj. Milling only asked you to go bring your medical papers."

123.    Ms. Headen's statements were plainly false since plaintiff had brought in a doctor's note and all relevant medical documentation on November 10.  Nor had plaintiff received any prior messages from Ms. Headen or anyone else at AlliedBarton.  Ms. Headen later admitted that she had been calling the wrong number.

124.    Plaintiff immediately recalled that Maj. Milling refused her request to put his decision in writing and wondered if Maj. Milling had lied about his November 10 meeting with her.

125.    Mr. Beresford then got on the phone and he suggested that they should meet. Although she was very concerned that the meeting would afford defendant another opportunity

to harass her and intimidate her into giving up her brace, Ms. Tabe told him that she was more than willing to meet with him just to hear what he had to say, to see if perhaps he would be cooperative this time, and agreed to meet with him on November 29, 2004.

126.    However, after talking with Mr. Beresford, she realized that he merely was making same assurances as Mr. Odom had on November 5, and given the circumstances of her prior meeting with Maj. Milling on November 10, she felt the need to document the events which had transpired and her communications with defendant.

127.    Plaintiff then wrote a letter to Mr. Beresford, emphasizing that Maj. Milling had in fact fired her and recounting the callous and humiliating circumstances of her firing.  She also pointed out that Capt. Milling refused to document his decision and expressed her loss of trust in its management.

128.    She wrote:  "After what [I] suffered these past weeks by way of intimidation, harassment, and finally termination, from Barton's managers, as well as their close collaborators, it is difficult for me to expect any further serious and meaningful <u>verbal</u> discussions with Barton's representatives, through whom the company has lost my trust (emphasis added)."

129.    Plaintiff sought to encourage written communications and to cause defendant to start documenting its decisions about her.  In support, plaintiff recapped how when Maj. Milling fired her, he "refused to document the decision to terminate [her]," and when she asked for a letter stating that defendant would not permit the brace, Mr. Odom declined to do so himself and referred her to HR.  Plaintiff pointed out that all the preceding events were not documented and referred specifically to Maj. Milling's oral firing of her; his oral refusal to document the decision; Capt. Yate's oral refusal to allow her to remain on post; Mr. Odom's oral order to go "home until [she] can produce a doctor's note saying that [she] could work without the brace;

Maj. Milling's oral reiterance that she could not work without the brace; and then Ms. Headen's oral remarks when she called her on November 23, 2004.

130.    Ms. Tabe hoped that her letter would appeal to AlliedBarton's managers' better instincts and good faith and convince them to accommodate her disability, and expected a written reply prior to the scheduled meeting, so that upon her return to IMF for the meeting, she would not be prevented from entering the building or disgraced and intimated again.

131.    However, she never received a response from defendant.

132.    Defendant thus did not refute plaintiff's essential claims of discrimination or termination.

133.    Plaintiff's last rate of pay was $16.07/hour.  At the time of her discharge, her pay for a 40-hour workweek was $642.80 per week.

134.    A few weeks after Ms. Tabe e-mailed Mr. Beresford, requesting her accrued 2004 vacation pay, but he did not respond to her request.

135.    Plaintiff later e-mailed Ms. Headen regarding her vacation pay, but she never responded.

136.    To date, Defendant has never paid her two weeks of salary (approximately $1,285.60) for the unpaid vacation pay.

### D.    STATEMENT OF CLAIMS

#### Count I:  Disability Discrimination  (ADA)

137.    Plaintiff adopts and incorporates by reference paragraphs 1-136 above.

138.    At all times during her employment with defendant, Plaintiff Angel Tabe was a qualified individual with a disability within the meaning of the ADA, 42 U.S.C. § 121118(8).

139.    As explained above, beginning in mid-2002, and continuing throughout the duration of her employment with defendant plaintiff experienced increased pain in her legs and back, particularly when walking on steps or up a slope.

140.    Her doctor prescribed stronger pain medication for her, instructed her to wear a third brace on her left knee—the good one, which was also deteriorating, and issued her three disability certificates containing restrictions on standing and walking.

141.    Plaintiff's back and leg injuries significantly restricted or prevented her from engaging in major life activities, including walking, sleeping, showering, cooking, shopping for groceries, socializing and standing; all of these activities were painful for her.

142.    In order to cope with the pain, she constantly wore her back brace, removing it only to shower, and even sat to do so.  She even she slept with her metal back brace, which supported her back and reduced the pain.

143.    As described above, plaintiff repeatedly asked defendant to make reasonable accommodations for her disability, including allowing her to wear a different uniform and transferring her to a more sedentary assignment.

144.    The accommodations she requested were indeed reasonable, since transfers between defendant's sites were normal and routine, openings existed, and defendant easily could have permitted her to wear a uniformed spring jacket or sweater for an additional day.

145.    However, defendant failed or refused to accommodate her disabilities.

146.    Defendant discriminated against plaintiff, in violation of the ADA, when it failed to make reasonable accommodations for her known disability.

147.    On or about November 5, 2004, defendant constructively terminated plaintiff.

148.    On or about November 10, 2004, defendant maliciously terminated plaintiff.

149.    By discharging plaintiff, defendant discriminated against plaintiff on the basis of her disabilities, her record of such, or regarded her as being more disabled than she actually was.

150.    By so discriminating against plaintiff on the basis of her disabilities, defendant violated the ADA, 42 U.S.C. § 12203.

151.    As a result of defendant's malicious violations of the ADA, plaintiff has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

<u>Count II</u>:  <u>Gender Discrimination (Title VII)</u>

152.    Plaintiff adopts and incorporates by reference paragraphs 1-151 above.

153.    Defendant unlawfully discriminated against plaintiff on the basis of her gender.

154.    Title VII makes it unlawful for an employer to discriminate in employment on the basis of gender.

155.    By sexually harassing plaintiff, as described above, Maj. Milling discriminated against plaintiff on the basis of her gender.

156.    By tolerating Maj. Milling's sexual harassment of plaintiff, despite her complaints about it, defendant discriminated against plaintiff on the basis of her gender.

157.    Also, upon information and belief, AlliedBarton provided reasonable accommodation for a similarly situated male employee by permitting him to use a cane on the job.

158.    By constructively discharging plaintiff and then by discharging her, defendant discriminated against plaintiff on the basis of her gender, in violation of Title VII.

159.    As a result of defendant's malicious violations of Title VII, plaintiff has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

Count III:  Gender Discrimination (DCHRA)

160.    Plaintiff adopts and incorporates by reference paragraphs 1-159 above.

161.    The District of Columbia Human Rights Act ("DCHRA"), District of Columbia Code §§ 2-1401.01 et seq. (2001), prohibits discrimination in employment "for any reason other than that of individual merit," including gender.

162.    The DCHRA, D.C. Code § 2-1402.11(a)(1) (2001), also makes it "an unlawful discriminatory practice" for an employer to discriminate in employment "wholly or partially" for one of the proscribed discriminatory reasons.

163.    As described above, defendant unlawfully discriminated against plaintiff wholly or partially on the basis of her gender.

164.    By sexually harassing plaintiff, as described above, Maj. Milling discriminated against plaintiff on the basis of her gender.

165.    By tolerating Maj. Milling's sexual harassment of plaintiff, despite her complaints about it, defendant discriminated against plaintiff on the basis of her gender.

166.    Also, upon information and belief, AlliedBarton provided reasonable accommodation for a similarly situated male employee by permitting him to use a cane on the job.

167.    By constructively discharging plaintiff and then by discharging her, defendant maliciously discriminated against plaintiff wholly or partially on the basis of her gender, in violation of DCHRA.

168.    As a result of the above-described discrimination, plaintiff has suffered, and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

## E.  <u>REMEDIES SOUGHT</u>

169.    WHEREFORE, plaintiff respectfully requests that the Court issue a judgment granting her the following relief from defendant:

a.    A declaratory judgment that defendant discriminated against plaintiff, as alleged herein;

b.    Reinstatement to a position similar to that which she held before her discharge, but with reasonable accommodation;

c.    Back pay, including without limitation other lost benefits due to defendant's discrimination against plaintiff;

d.    Compensatory and punitive damages in the amount of $300,000, pursuant to the ADA and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §§ 1981a(a)(2), 1981a(b)(3)(A), for taking these actions with malice and bad faith;

e.    Alternatively, compensatory damages and punitive damages under the DCHRA, D.C. Code §§2-1403.13(a), 2-1403.16(b) (2001), for maliciously and wrongfully discriminating against plaintiff;

f.    Alternatively, compensatory damages and punitive damages up to the amount of $300,000 under Title VII and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §§1981a(a),(b)(3)(A), for maliciously and wrongfully discriminating against plaintiff;

g.    Prejudgment and postjudgment interest thereon, on the lost compensation and compensatory damages, effective November 5, 2005;

h.    Reasonable attorneys' fees and costs under the DCHRA, D.C. Code 2001, §§2-1403.13(a)(1)(E), 2-1403.13(a)(2), 2-1403.16(b), Title VII, 42 U.S.C. §2000e-5(k), and 42 U.S.C. § 12117; and

i.    Such other and further relief as to the Court seems just and warranted.

### F.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

170.    On or about April 13, 2005, and before filing this case, plaintiff filed a timely complaint of discrimination against the defendant with the Equal Employment Opportunity Commission (hereafter "EEOC"), Charge Number 100-205-00835, alleging disability and gender discrimination.

171.    Pursuant to its worksharing agreement with the D.C. Office of Human Rights, *see* 42 U.S.C. § 2000e-8 (b), the EEOC cross-filed her claim with OHR.

172.    Pursuant to D.C. Code § 2-1403.16(a), the cross-filing of her claim tolled the statute of limitations for her to file a private cause of action under the DCHRA.

173.    After the passage of more than 180 days, on or about September 28, 2007, the EEOC issued plaintiff a right-to-sue notice.

174.    Plaintiff received the letter approximately seven days later.

175.    Plaintiff filed her original complaint *pro se* on November 13, 2007, within 90 days of receiving the right-to sue letter from the EEOC.

176.    Plaintiff has the right under the DCHRA, D.C. Code §§ 2-1403.03(b), 2, 2-1403.16 (2001), to bring a private cause of action for alleged violations of said Act, without the necessity of exhausting any particular administrative remedies which were also available to her.

177.    Also under that statute, § 2-1403.16(a), the time for her to file her private cause of action was tolled while her case was pending, not just at OHR, but also at EEOC since EEOC and OHR share cases under their worksharing arrangement.

178.    By virtue of the tolling, plaintiff used up only about 205 days of her 365-day limitation period under the DCHRA.

179.    Accordingly, plaintiff has complied with all administrative prerequisites before filing her discrimination suit.

## G.  JURY DEMAND

180.    Plaintiff requests a jury trial on all issues of fact and damages arising herein.

## VERIFICATION

I hereby certify under penalty of perjury that I am the plaintiff in the above-captioned case; that I have read the foregoing Verified Amended Complaint; and that the facts related herein are true and correct to the best of my knowledge, information, and belief.

Executed at Silver Spring, Maryland, this ___ day of May, 2008.


_____

ANGEL TABE


Respectfully submitted,


_____/s/ Alan Banov_____
ALAN BANOV #95059
Alan Banov & Associates
8401 Colesville Road, Suite 325
Silver Spring, MD 20910
301-588-9699; fax:  301-588-9698
abanov@banovlaw.com
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGEL TABE,                                              )
                                                        )
                            Plaintiff,                  )
                                                        )
              v.                                        ) Civil Action No. 07-02043 (RMU/AK)
                                                        )
ALLIEDBARTON SECURITY SERVICES,                         )
                                                        )
                            Defendant.                  )
_____)

## ORDER

      Upon consideration of the Motion for Leave to File Amended Complaint, defendant's

response thereto, and the record herein, it is this _____ day of May, 2008, hereby ORDERED that

said Motion is GRANTED and that the Clerk will file the Amended Complaint.

Date: _____            _____
                                         RICARDO M. URBINA
                                         JUDGE
                                         UNITED STATES DISTRICT COURT
                                         FOR THE DISTRICT OF COLUMBIA

Copies to:
Alan Banov, Esq.
Alan Banov & Associates
8401 Colesville Road
Suite 325
Silver Spring, MD 20910

Marty N. Martenson, Esq.
Donna L. Keeton, Esq.
Martenson, Hasbrouck & Simon LLP
3379 Peachtree Road, N.E., Suite 400
Atlanta, GA  30326

2

James E. McCollum, Jr., Esq.
Amit K. Sharma, Esq.
McCollum & Associates, LLC
7309 Baltimore Avenue, Suite 117
P.O. Box 1717
College Park, MD  20740-1717